**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CHERYL WHITNEY,**
             **Plaintiff,**

**-vs-**                                                       **Case No.  6:06-cv-216-Orl-UAM**

**COMMISSIONER OF THE SOCIAL**
**SECURITY ADMINISTRATION,**
             **Defendant.**

_____

**ORDER**

Plaintiff Cheryl Whitney ["Whitney"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] determining that there was medical improvement in her condition as of July 8, 2004, and that Whitney was entitled only to benefits for the closed period of July 22, 2002, through July 7, 2004.  For the reasons set forth below, the Commissioner's decision is **REVERSED and REMANDED**.

**I.**    **PROCEDURAL HISTORY**

Whitney filed an application for disability insurance benefits on December 17, 2002, alleging disability since July 31, 2001. On July 6, 2005, an administrative law judge (ALJ) found Whitney was disabled for a closed period from July 22, 2002, to July 7, 2004, but not thereafter. R. 16. The ALJ found that Whitney's condition had improved as of July 8, 2004, and that she had the residual functional capacity ("RFC") to perform her past relevant work as a cafeteria attendant. R. 20, Finding 6.

The Appeals Council denied review on December 15, 2005. R. 5-7. On February 21, 2006, Whitney appealed the Appeals Council's decision to the United States District Court. Docket No. 1.

On January 12, 2007, Whitney filed in this Court a memorandum of law in support of her appeal. Docket No. 22. On February 28, 2007, the Commissioner filed a memorandum in support of his decision that Whitney was not disabled. Docket No. 24. The appeal is ripe for determination.

## II.   THE PARTIES' POSITIONS

Whitney contends the Commissioner made three errors. First, Whitney argues that the Commissioner's finding that Whitney's mental condition improved in 2004 on a sustained basis was not supported by substantial evidence. Second, Whitney argues that the Commissioner erred in failing to articulate any reasons for not crediting the opinions of two independent state agency medical experts who indicated that their assessments of Whitney's mental limitations extended through December 2006. Finally, Whitney contends that the Commissioner erred in failing to articulate any reason for not fully crediting her testimony. The Commissioner contends that substantial evidence supports the Commissioner's decision and that the decision should be affirmed.

## III.   THE STANDARD OF REVIEW

### A.   AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B. REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate

award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.  REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to

consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

> In contrast, sentence six of 42 U.S.C. § 405(g) provides:
>
> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[1] *Id.*

---

[1] The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

## V.     APPLICATION AND ANALYSIS

Whitney was 43 years of age at the time of the ALJ's decision. R. 12, 32. She has a high school education and past work as an art framer, a cafeteria attendant, and a bartender. R. 33, 34, 159, 195, 202.

Whitney has an lengthy history of psychiatric care. As early as 1977, as a 16 year old, Whitney was admitted to the Psychiatric Institute for evaluation. R. 218-235. Whitney had run away several times in the previous year. R. 218. After being hospitalized for two weeks, she ran away with another patient and did not return. R. 220. She was diagnosed with runaway reaction of adolescence and it was recommended that she be hospitalized for continued treatment at another facility if she returned. *Id*. Approximately two weeks later, Whitney turned herself in and was admitted to The Sheppard and Enoch Pratt Hospital for depression. R. 207-217. She was discharged five months later with a diagnosis of depressive neurosis. R. 213, 215.

From March 9, 2001 to August 27, 2001, Walter P. Shepard, Ph.D. treated Whitney for depression and alcohol abuse. R. 239. He saw her for a total of 20 sessions. *Id*. Her final diagnosis was alcohol dependence (303.90), cocaine dependence (304.20), and anxiety disorder NOS (300.00) *Id*.

Beginning in July 2001 through June 2002, Robert E. Groble, M.D., treated Whitney. R. 236-238. Dr. Shepard referred Whitney for treatment due to a self-described history of "highs and lows often leading to self destructive behavior and suicidal thought." R. 236. At the time of her

---

Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

referral, Whitney was taking Lithium and Paxil.  R. 237.  Dr. Groble saw Whitney a total of three times.  Whitney described her efforts to stay away from drugs and alcohol.  Grobel added Xanax as a medication, but did not diagnose her condition.  R. 238.   On March 20, 2002, Whitney stopped taking all her medications, but was advised to go back on Effexor due to increased irritability.  R. 238.  In June 18, 2002, Whitney ran out of her Effexor and had severe withdrawal symptoms.  *Id*.

On July 23, 2002,  Whitney was admitted to the Ten Broeck Hospital for substance abuse and mental illness. R. 240-252. Upon admission,  Whitney described an extensive history of episodically disabling dysphoria and polysubstance abuse. R. 244.  During her evaluation with Dr. Lepely,  she described feeling depressed her whole life, implying episodic apathy, anaerobia and withdrawal.  R. 246.  Whitney denied a history of discernible bipolarity, psychosis, eating, sexual, psychosomatic, somatoform, or dissociative, impulsive or anxiety-related disorders.  R. 246.   Whitney failed to disclose any prior psychiatric admission.  R. 246.  Dr. Lepely believed that Whitney's main "pitfall" related to extensive and disabling dysphoria, compounded by polysubstance abuse.  R. 247. Mental examination showed that she described her mood as depressed and endorsed a preferentially constricted affect, appearing variably hopeless and helpless.  *Id*.  Her Axis I admitting diagnosis was: 1.) depressive disorder NOS versus major depression, recurrent, without psychotic features and acute exacerbation; 2.) history of alcohol dependence and abuse continued versus episodic (?); 3.) history of multiple alcohol blackouts, at least a half-dozen alcohol-induced delirium,  and at least one alcohol withdrawal seizure;  and 4.) history of polysubstance abuse, including cocaine and heroin, with alleged

remission. R. 248. Her admitting Global Assessment of Functioning ("GAF") was 25-30.[2] *Id*. The admittance plan included suicide precautions, individual psychotherapy sessions, preventive medication. *Id*. On July 31, 2002, Whitney was discharged into her own custody with a diagnosis of depressive disorder versus bipolar disorder NOS; rule out major depression, recurrent without psychotic features in discrete remission; and history of alcohol dependence and abuse, now in remission. R. 250. Her discharge GAF was in the vicinity of 50.[3] *Id*. Effexor was prescribed. R. 251.

On December 31, 2002, Whitney was evaluated at the Associates in Psychiatry for Brevard for medication management. R. 255-256. Whitney described going through periods of shopping sprees and impulsive behavior and self mutilation. R. 255. For the past several weeks, she had been feeling a little high and having financial problems. She could not focus. She was diagnosed with bipolar disorder type II and alcohol abuse in remission. R. 256. She was prescribed Effexor XR, Depakote ER, and Seroquel. *Id*. She was referred to Dr. Maddali for continued care. *Id*.

Parwati Maddali, M.D. commenced treating Whitney on December 31, 2002. R. 253. On January 29, 2003, Dr. Maddali instructed Whitney to continue the Depakote, take Lexapro, and decrease her Effexor dose. *Id*. 253. As of March 26, 2003, Whitney continued to cycle and her depression was more noticeable, but her anxiety was decreased. R. 254. Whitney attributed the loss

---

[2] The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"] at 32. A GAF code of 21-30 indicates that behavior is considerably influenced by delusions or hallucinations, or serious impairment in communications or judgement (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or inability to function in almost all areas (e.g., stays in bed all day, no job, home or friends).

[3] A GAF code of 41 - 50 indicates serious symptoms, or serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job). DSM-IV at 32.

of her job due to mistakes she made because she had difficulty concentrating. *Id*. On May 21, 2003, she was having less hypomanic episodes and was not agitated. R. 275. She continued in a depressive cycle and was lethargic with decreased interest. *Id*. She was diagnosed with continued depressive episode and was given samples of Depakote and Lexapro. *Id*. On July 9, 2003, Whitney continued to cycle up and down and was fearful of losing control. R. 306. Dr. Maddali recommended complete abstinence from alcohol and gave her samples of Depakote and Lexapro. *Id*.

At the request of the state agency, on August 6, 2003, Howard R. Bernstein, Ph.D., performed a psychological examination. R. 295-298. Dr. Bernstein observed Whitney was in mild distress and her behavior and emotions were slightly anxious and stress sensitivity. R. 298. Her presentation was slightly hyper and overactive. *Id*. She gave a medical history of overdose and withdrawal from drug seizure and multiple head trauma with no neurologic residuals. *Id*. Whitney had been sober and clean for twelve months and attended AA as follow up. *Id*. She had multiple inpatient psychiatric admissions for bipolar depression, potentiated by substance abuse. *Id*. Her psychiatric stability seemed fragile but Whitney presented herself as a survivor and a past history of personality trait disturbance was offered. R. 297. Her motor activity was slightly elevated and her mood was anxious. *Id*. She gave a history of self-abuse and self-destructive behaviors. *Id*. Dr. Bernstein stated that Whitney was psychologically fragile and that emotional and motivational controls might be tenuous and emotional support was suggested. R. 296. Whitney would require assistance to deal with emotional and vocational demands. *Id.* Dr. Bernstein concluded that Whitney's signs and symptoms were consistent with a major mood disorder, bipolar depression, substance abuse in remission and

personality traits were dependent and borderline. *Id*. Dr. Bernstein recommended part-time activity in a low stress environment. *Id*.

Dr. Maddali completed medical source statements on August 15, 2003. R. 299-300. Dr. Maddali opined Whitney was moderately limited in understanding and remembering short, simple instructions, carrying out short simple instructions and making judgments on simple work related decisions. R. 299. She was markedly limited in carrying out detailed instructions and understanding and remembering detailed instructions due to frequent panic attacks, poor concentration, physical pain, and cognitive impairment. *Id*. She was markedly limited in interacting appropriately with supervisors and responding appropriately to changes in a routine work setting, and had a moderate impairment in interacting with the public, interacting appropriately with co-workers and responding to work pressures in a usual work setting. R. 300. Whitney had a poor capacity to perceive instructions and criticism objectively and had catastrophic thinking and a very poor self image. *Id*. Dr. Maddali further opined that Whitney would not be able to work for continued periods of time and could not be in a work setting that required her to sit or stand for more than thirty minutes because she paced and had to lie down frequently. R. 300. Her past history of alcohol and substance abuse did not contribute to her limitations set forth above. *Id*.

On September 18, 2003, Whitney stated she felt very anxious at times, and that "marbles were being shaken in her head." R. 307. She continued to have brief episodes of racing thoughts and her sleep was erratic. *Id*. She was told to continue on her medications. *Id*.

Nancy MacKay, Psy. D. treated Whitney for bipolar disorder on six occasions from October through December 2003. R. 303. Whitney's attention and concentration appeared mildly to

moderately impaired. *Id*. Although Whitney appeared able to make use of therapeutic tools most of the time, she continued to feel overwhelmed by situations that required her to meet deadlines or the expectations of others, and she struggled with self-doubt regarding her abilities in the workplace. *Id*. She had remained sober and active in AA meetings. *Id*. Additional therapy was recommended. *Id*.

On December 11, 2003 and February 26, 2004, Dr. Maddali re-examined Whitney. Tr. 305. She did not have much relief and continued to have multiple stressors. She was trying to work one to two hours in a frame shop. Whitney was extremely sensitive to any comments from authority figures. Whitney was told to continue Depakote and Lexapro and she was given samples of Strattera. Tr. 305. On February 26, 2004, Whitney stated she had some improvement in concentration but continued to have episodes of raciness and her speech was pressured. Her sleep was reported to be four to five hours and Dr. Maddali discussed increasing her Strattera. R. 305.

Whitney saw Dr. MacKay for six sessions from January 13 through March 25, 2004. R. 302. During her sessions, Whitney's attention and concentration appeared moderately impaired and her mood was generally good and her affect congruent. Her facial expression was smiling, regardless of her mood and affect, sometimes incongruently. Whitney felt the increased Strattera was helping her focus, but she felt her manic symptoms were increasing and she found herself working on many projects at one time with more difficulty completing them. She was less able to concentrate if there were any distractions, but she was able to keep up with most of her commitments. Dr. MacKay was concerned that Whitney's self-imposed rules regarding abstinence from drugs, alcohol and shopping would be insufficient for her to avoid self sabotage or that her manic phase would be followed by a debilitating depression. R. 302. Additional therapy was recommended. *Id*.

Whitney saw Dr. MacKay for an additional six sessions from April 8 through July 8, 2004. R. 301. During this time period, Whitney's mental status varied widely over her sessions. R. 301. At her April 8, 2004, session, she was unhappy and acknowledged that eliminating the mood stabilizer from her medication regimen had not been efficacious. She was disappointed to have to go back on it. At the second session, she was both depressed and agitated. She was back on her mood stabilizer but was experiencing some severe anxiety and agitation. Despite her psychological distress, she was continuing to meet obligations at work and at home and participating actively in AA. Her creativity as an artist was greatly decreased. Whitney showed improvement at her final session and she was taking Depakote, Lexapro, and Straterra and exercising frequently. She was not experiencing any anxiety or agitation. Her affect and expression were congruent with the situation and the content of her thoughts. Speech was at a within normal limits and there was less tangentiality. She had experienced these improvements with some fluctuation over the past eight weeks. Whitney appeared to be moving towards a level of stability that Dr. MacKay had not observed in her in the past. She appeared to be ready to enter college in the fall term. *Id.* Additional therapy was recommended.

Dr. Maddali treated Whitney on July 20, 2004. R. 308. Whitney reported she had a new relationship that seemed stable. *Id.* Whitney continued to cycle mildly, but was able to work with the vocational rehabilitation counselor. *Id.* Her sleep also was improved. *Id.* Her mental status was evaluated and showed poor insight at "one," poor concentration at "two" out of four, pessimism at "one" out of four, and depression as a "two." *Id.* She was told to continue her medications. *Id.*

On November 24, 2004, Dr. Maddali again saw Whitney. R. 309. Whitney explained that she tried some art classes and got very self conscious. *Id.* She continued to cycle mildly. *Id.* Her sleep

was improved but she was anxious at times. *Id*. Poor insight was listed at "two" out of four, poor concentration was "two" out of four, labile was "two" out of four, depression was listed as "two," and agitation was listed as "two" out of four. She was told to continue on her medications. *Id*.

At her hearing on February 1, 2005, Whitney stated that she can have a panic attack almost every day, but that they are "not so major that I don't fall to pieces." R. 45. She started taking college courses in drawing and also was taking on-line courses by using the computers at the public library. R. 54-55. The on-line classes are for two days a week, two hours per session. R. 56. Whitney's typical day includes AA meetings, exercising for two hours at a gym, working on her drawings, gardening, reading, and housework. R. 56-59.

### B.     THE ANALYSIS

#### 1.     **Applicable Evaluation Standard and Burden of Proof**

The ALJ in this case applied the five step sequential evaluation process found at 20 C.F.R. § 404.1520, which is used for the evaluation of initial claims. R. 17. The Commissioner argues that the correct evaluation method was not the five step sequential evaluation process, but the procedure set forth in 42 U.S.C. § 423(f) and 20 C.F.R. § 404.1594, which is used to terminate benefits based on medical improvement. Docket 24 at 6. Although it seems incongruous that the Commissioner would suggest that the ALJ applied the wrong legal standard without requesting remand, the Court is now left with the task of determining the correct standard.

This case is appropriately characterized as a "closed period" case. In a "closed period" case, "the decision maker determines that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of his decision." *Pickett v. Bowen*, 833 F.2d

288, 289 n.1 (11th Cir. 1987). "Closed period" cases are to be determined by the medical improvement standard. *See, id.* at 291. Under the medical improvement standard, benefits may be terminated when there is substantial evidence that demonstrates: "(A) There has been any medical improvement . . . related to the individual's ability to work [ ]and (B) the individual is now able to engage in substantial gainful activity." 42 U.S.C. § 423(f).

The appropriate evaluation standard, however, only addresses part of the issue. The parties also dispute who bears the burden of proving the medical improvement standard has been met. The Commissioner argues that Whitney at all times bears the burden of proving she is disabled. Docket 24 at 12. Whitney contends that the burden lies on the government and the Commissioner failed to meet his burden of proving that Whitney's psychiatric condition medically improved to the point of being able to return to work. Docket 22 at 9.

The United States Court of Appeals for the Eleventh Circuit has not addressed who bears the burden of proving the medical improvement standard has been met. The only circuit court to have addressed the issue is the Fifth Circuit, and it has ruled that "the government must, in all relevant respects, prove that the person is no longer disabled." *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A detailed analysis of the basis for allocating the burden of proof on the government is set forth in *Robbins v. Barnhart*, 205 F. Supp. 2d 1189, 1195-1199 (D. Kan. 2002). The Court concurs with the analysis in *Robbins* and rules that the government bears the burden of proving both medical improvement relating to the claimant's ability to work, and the claimant's ability to engage in substantial gainful activity.

As the ALJ did not assign a burden of proof to either party, the Court interprets the parties' arguments regarding burden of proof as relating to the present appeal.

## 2. **Substantial Evidence Supporting Medical Improvement**

Even if the ALJ used the five-step sequential evaluation process, if the ALJ also determined medical improvement as required by Section 423(f), any error would be harmless. Medical improvement that is related to the ability to do work is any decrease in the severity of the claimant's impairment, and an increase in the claimant's functional capacity to do basic work activities. 20 C.F.R. § 404.1594(b)(3). Whitney argues that the ALJ's finding that Whitney had medically improved was based on a short progress note by Dr. Mackay on a single day. Docket 22 at 11. Whitney further argues that the ALJ misunderstands the nature of Whitney's bipolar disorder, which results in fluctuations of Whitney's mental state. *Id*.

A careful reading of the ALJ's decision demonstrates that the ALJ did not rely upon Whitney's condition on a single day. Rather, the ALJ noted that Whitney had "gradually" improved to the point that she showed "great improvement" by July 8, 2004. R. 18. Dr. MacKay noted that "[d]espite her psychological distress, she was continuing to meet obligations at work and at home, and participating actively in AA." R. 301. Whitney was exercising regularly and attending to her nutrition. R. 301. Dr. MacKay found it "particularly impressive that despite the various phases of emotional distress that Ms. Whitney has experienced, she has maintained her abstinence and has met all of her responsibilities." R. 301. Whitney also appeared ready to enter college in the fall. R. 301.

In addition to Dr. Mackay's findings, the ALJ also relied on Whitney's own testimony at her 2005 hearing. R. 19. Whitney testified that although she still had panic attacks, they were not major

episodes. R. 45. She also testified that she started college classes in the fall of 2004 and was also taking online courses. R. 54-55. Describing her usual day, Whitney stated she went to AA meetings, exercised for about two hours at a gym, went to class, and gardened. R. 57. She also read magazines and books, did household chores, and occasionally went shopping. R. 58-59. Although Whitney experienced fluctuations in her condition, she nevertheless was able to keep appointments, keep up with most of her commitments, and interact with others. R. 302.

Dr. Maddali's notes after July 8, 2004, present a similar picture. He noted that Whitney had a new relationship that seemed stable. Although Whitney continued to cycle, she was able to work with vocational rehabilitation. R. 308. In November 2004, he noted Whitney's cycling with "mild." R. 309. Therefore, in spite of fluctuations or cycling, the evidence suggests that Whitney had regained her ability to function.[4]

Despite the opinion of Dr. Mackay that Whitney had improved and had achieved a level of stability, Whitney argues the ALJ should have ignored the treating physician's opinion and relied instead on the opinions of the consulting state agency physicians. Whitney argues that the ALJ failed to weigh the opinions of the state agency physicians and committed reversible error by failing to state with specificity why he rejected those physicians' opinions that Whitney would be disabled through December 2006. Docket 22 at 15.

---

[4] An individual's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Some individuals may actually have worked during the period of time pertinent to the determination of disability. Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ stated that he weighed the findings of the state agency physicians "as statements from nonexamining expert sources." R. 19. In the Eleventh Circuit, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2). Indeed, if a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The opinions of nonexamining physicians, when contrary to those of the examining physicians, are entitled to little weight and, standing alone, do not constitute substantial evidence. *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987). The ALJ is required to state with particularity the weight he gives to the different medical opinions and the reasons therefor. *Id*. at 279. Failure to make these findings is reversible error. *Id*.

The ALJ's statement of the weight accorded to the state agency physicians does not satisfy the requirements of *Sharfarz*. The ALJ made no findings, for example, that the opinions by the state agency physicians were either contrary to the opinions of the treating physician or unsupported by medical evidence. For the Court to infer such findings improperly places the Court in the position of fact finder. The case, therefore, must be reversed and remanded pursuant to Sentence Four for the Commissioner to weigh all of the medical opinions and to state with specificity the basis for rejecting any medical opinion.

### 3. Assessing Whitney's Credibility

Whitney argues that although the ALJ stated that "the claimant's description of her limitations is consistent with the record when considered in its entirety" (R. 19), the ALJ failed to credit her testimony as to her limitations and failed to articulate any specific reasons for not doing so. Specifically, Whitney argues that she testified that she had difficulties dealing with people and crowds and experienced anxiety when faced with deadlines, but that the ALJ failed to make any findings regarding these issues. Docket 22 at 19. Whitney argues that if the testimony regarding her limitations is credited, she could not perform the job of a cafeteria attendant. Docket 22 at 20. The Commissioner argues that the ALJ did not discredit Whitney's testimony, but that his findings were consistent with her testimony.

Initially, Whitney fails to show that the position of cafeteria attendant requires dealing with people, crowds or deadlines. Further, based on Dr. Mackay's records and Whitney's testimony, the ALJ concluded that Whitney's restrictions in daily living and social functioning were only mild. R. 19. Although Whitney selects certain portions of her testimony regarding her difficulties with people, crowds, and anxiety, she ignores other testimony that shows she can cope effectively with those situations. There is no apparent error in the ALJ's treatment of Whitney's credibility.

## VI. CONCLUSION

For the reasons stated above, the Court reverses and remands the decision of the Commissioner pursuant to Sentence Four for further proceedings.

**DONE AND ORDERED** on August 10, 2007.

*Donald P. Dietrich*
DONALD P. DIETRICH
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Nancy R. Bartlett, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

The Honorable Robert D. Marcinkowski
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817-9801